The next case on this morning's docket is the case of Laura Welch v. Timothy Welch. And we have Kelly Patterson-Evans for the appellant and Mr. Bill Walker for the appellee. Ms. Evans, you may begin. Good morning. My name is Kelly Patterson-Evans and I'm the attorney for the appellant Laura Welch. Laura married her husband Tim in 1987 when she was 17 years old. By the time she was 23 they had two children and by the time she was 24 she was on social security disability. Laura suffers from systemic scleroderma as well as Raynaud's phenomena. Systemic scleroderma is an autoimmune disorder with no cure. It's progressive so it will not get better, it will just get worse. As a result of these conditions she has significant circulatory problems. She has already lost a thumb on her right hand and toes on either foot. She relies on a home health care worker to help her with basic tasks like laundry and cleaning and personal grooming. She's unable to work. At one point during the marriage she received permission from a doctor to work and got a job at Walmart. It aggravated her conditions and led to blockages in her heart. Her doctor will no longer permit her to work. There's no question that she's disabled, there's no question that she's unable to work. There's equally no question that throughout the marriage Tim, who worked as an auto body repairman, was the breadwinner for the family. Throughout the marriage up until their separation he admits in the transcript that he had always been the one responsible for the payment of the family bills. In the marriage of Brackett, the second district, citing cases from the third district, declared permanent maintenance should be the rule and not the exception when the former spouse is disabled to the point that he or she is unable to work. Thus the court should concentrate heavily on the spouse's physical condition in fashioning the award. In Brackett, the lower court had actually entered an award of maintenance but had made it rehabilitative. The wife in that case suffered from multiple sclerosis, relied on an assistant for care, and there was no reasonable expectation to think she would ever be able to return to work. That court found that that case was not the exception to the rule and reversed for an order of permanent maintenance. The court in this case made a far greater exception to the rule and actually completely denied my client's claim for maintenance and forever barred her from seeking the award of maintenance from her husband of 25 years. At the time it did so, Laura was receiving $639 in disability and an additional $189 in food stamps, leaving her with $828 a month to live on. Again, she can't go back to work. She can't supplement that income. $828 is all she will have to live on. Interestingly, in 2014 when that judgment came down, the poverty threshold in the United States for a single person was $11,670. Laura's income at $828 a month is less than $10,000 a year. So effectively the judgment that was entered by the trial court has subjected and ensured that my client will live in poverty for her lifetime by denying her an award of maintenance from Tim, her husband of 25 years, the admitted breadwinner throughout the marriage. The trial court's expressed reason for denying maintenance was the trial court stated that you had failed to prove income by the husband sufficient to warrant maintenance. Is that right? Yes, Your Honor. And yet the husband does everything on a cash basis, doesn't have a bank account, files no tax returns. You hired a private investigator but still couldn't come up with anything. But under the trial court's present order now, the husband could go back to making $60,000 a year and she couldn't come back in to get maintenance. She's permanently barred from maintenance. And I will point out to the extent that it's relevant that I was not trial counsel. Well, I say you. Sure. I was actually brought in at the end of the case to argue the motion to reconsider, and I am taking this case pro bono on behalf of my client at this point. Yes, the court did find that there was no evidence to support the notion that he could pay maintenance. Is there some element here of rewarding the husband for doing everything on a cash basis? Absolutely. That is exactly what I would say. How does this happen? And it happens because the trial court rewarded the husband for first declaring that he was no longer able to work full time, and then for giving his business, a business that he had run for 30 years to his 21-year-old son, a son who had never worked full time as an auto body repair person, a son who had certainly never run an auto body shop, and whose prior vocation was a Domino's pizza delivery driver. Just gave it to him in the middle of the case. There's another case law that says that certainly is suspicious when you do that. In the middle of the case, you divest yourself of your business in order to reduce your income. Was there actually an admission that he never paid taxes on the secondary job? Correct. Throughout most of the marriage, he had had a W-2 income, but he, through the whole time, maintained Mafia Brothers customs. And it was the custom of Mafia Brothers customs not to pay taxes, not to declare that income. And was there, I think she said that he earned about $20,000 a year. Right. Was that refuted in any way? It was not, and actually, I think it was substantiated by husband, because if you read the transcript, husband throughout it basically says, I don't know anything about money, I didn't handle the money, and specifically says that Laura handled the money for the family. Laura's unrefuted testimony was that just in what he gave her, which she indicated she did not believe was all of the money that was earned by Mafia Brothers customs, that at least $20,000 a year was given to her from that part-time work at Mafia Brothers customs. And that was cash? Cash money. And there's no dispute that there's not going to be a tax return that was ever going to be presented that showed the income from Mafia Brothers. The record shows that there was some questioning from counsel for the husband about that, and the judge got very frustrated and said, I get it. You know, this isn't an IRS case. It's not going to show up. She's going to say it's one thing. He's going to say it's another. But he really didn't say it's another. He said she manages the money, and she said it was at least $20,000 a year. The question that was posed was actually, was it more than $20,000 a year? The answer to that question was an absolute yes. It provided for family vacation. She indicated they were able to eat out on a regular basis. You know, no one's going to mistake these people for being rich. But her own testimony was that they lived well. And now his income that he earned from employment that he did file tax returns on, when did he put that in connection with the divorce? I will be honest with you. There was some back and forth on dates, and it got a little confusing, again, because I didn't have the benefit of actually being the underlying attorney. It appears at one point he testifies it happened in 2009. I think that was actually 2010 that up until some point. When he was fired? At which point he was fired. His husband references that it happened the day before homecoming, I believe, in 2010. There was an accident of the younger son that happened. So he was fired at that point, but he continued to work at Mafia Brothers and at that point just ran that business as a full-time business. Was there any indication that he made an effort to get another job doing what he had done before after 2010? No. He was specifically asked whether he had sought employment, and he answered very specifically that he had not done so and had no intention to do so. And did he use his disability as an excuse? Right. He put on his hat as Dr. Welch, declared himself disabled, and decided that he was no longer going to seek full-time employment, which had been the custom throughout the marriage. Did they put on a physician? No. Well, that was hearsay testimony. Yes. I don't even think there's hearsay testimony about what a doctor said. The testimony is very clear that this case was filed in September, I believe, of 2011, and the trial was heard two and a half years later. At that point, at some point during that period of time, he had filed for disability, but that had been denied in 2012, more than two years before the trial. He hadn't even sought an appeal. He hadn't refiled, so he had just basically abandoned that. At no point while the case was pending had he seen a doctor for the conditions which he now claimed prevented his full-time employment. Well, I read that part of what he did was make estimates. Right. Would that have required him to use his hands in such a fashion? It certainly would not. His testimony was that he was now limited in his ability, and it all seemed to spin around using a sander. I'm using a what, I'm sorry? A vibrator sander. Okay. That he couldn't do that on a regular basis. But he also testified that his son now ran the shop, but that he was there five days a week from the time the shop opened until it closed, not only assisting with sanding jobs, but also estimating jobs for which he could give binding prices, ordering tools, answering the phones, greeting customers. He was doing all sorts of other activities that if you did for an employer who wasn't your son, you would certainly expect to be compensated for. However, his arrangement with his son was that his son just paid him whatever it is that his son felt like he would pay him. It could be $100. It could be $200. Quite frankly, it could be anything because the court found that his testimony wasn't credible. It's not put into a bank account. It was always cash. He has no record of what that money is. He doesn't believe his son has any record of what that money is. And so talk to me a minute about the court found that he was not a credible witness, and then the court found that she did not prove. So my question is whose burden of proof was it here? I mean, it seemed like the court shifted a burden. It did, and I don't think that the court properly shifted the burden because there's case law that says what you do in a situation like that, and the answer isn't that you put the burden on the other side to try to take depositions or to hire a private investigator or to do all these sorts of things. What the case law says, and it comes from Morse, is that when present income is uncertain, the court may consider past earnings. Morse was a similar situation. The husband had run his own business. He liquidated the business during the course of the case and then declared I can't financially afford to pay maintenance to my wife. That trial court didn't agree with that, and the court said the simple fact that you've chosen to be voluntarily unemployed, the simple fact that you've liquidated your business during this divorce is not something we're going to reward. This trial court took a very opposite approach and said we can't figure out what you're making, so I guess you just get out of paying maintenance because she didn't show us what you're making, which is a burden she was never going to be able to meet. His own testimony when asked by trial counsel, if the IRS came calling, how would you show them what you make, he said I don't know, I don't know. How in the world was my client going to be able to accomplish something that he wasn't able to do? But the bottom line is she doesn't need to do that. There was no dispute that when he had worked for W-2 Income, he'd earned in the 60s. His own testimony, the last job he recalled bringing home income from outside of the Mafia Brothers Customs Income was that he brought home $750 a week. With an income like that, we don't need to really focus on whether he was making $40,000 or $60,000 or $80,000. My client's prayer for maintenance was $1,000 a month. She asked to be able to live on $1,800 a month. It's not much. But at the time that she was living, and again, she was getting nothing from her husband throughout this case. She was living on the $828. Her lights were about to be turned off. She can't be expected to go pay for depositions. She can't really be expected to pay for anything. This case was filed by legal aid. It's being tried at the appellate level on a pro bono basis. She has no money. She cannot be expected to carry the burden of proving, after the court found that he wasn't credible, what it is he was making. That's why the case law says, you go back and you look at what they were earning in the past. There are other examples where the court has done the same thing. In Smith, the case was pending. Husband had been a president of a company during it, and he says, you know what, I'm going to retire. I've always wanted to do consulting work, and so that's what I'm going to do. The trial court based his maintenance on that lower level and was reversed by the appellate court. And the appellate court said something that I think is important to note, and it says, it's important to note that the husband's use of the word retirement to describe his voluntary leaving of his job and subsequent reduction of his income does not automatically confer some preferred status on his actions. The act refers to the ability of the maintenance-paying spouse to contribute to the other's support. In our view, the word ability indicates that we should consider the level at which the maintenance-paying spouse is able to contribute, not merely the level at which he is willing to work. Well, not only ability, but here we don't even know what he actually does earn because it's all under the table. It's all under the table, and that's obviously by his choice. Just like the choice to have the business now be run by his son is by his choice. His son would never have been in a position to start this business, to run this business, except for the fact that he chose to, I'm going to give you my tools, I'm going to give you my company name, I'm going to give you it all, it's all yours, you run it, and now you decide what you pay me. I'm going to go to work. But this kind of work is not something that just anybody can do. I mean, there must be a young man who delivers Domino's pizza cannot just automatically step from that job into this kind of job where you're fixing cars. I wasn't clear whether this was an auto shop. It's body work. It's body work, but there was also testimony that the husband also was able to do repair work. What does that mean? I thought it was body work. Is it also mechanical? It also is mechanical, and if you actually look at the portion relating to how he paid his attorney's fees, he paid it by doing mechanical work for his trial attorney. Your time has expired. I still have the opportunity for rebuttal, Mr. Walker.  Mr. Walker? Your Honor. Hello. Your Honor. This does kind of look like a primer on how you go about avoiding paying maintenance. I would disagree with you, Your Honor. Okay. And this is why I would disagree. I mentioned in my briefing, it would be a time machine to go back. If you look at the record and see what the marriage was, what the lifestyle was of this couple before the divorce, before she left the house, there was bankruptcy, there was foreclosure, there was repossession. My client was fired for his steady job he had because he took the appellate to the doctor and the people didn't like it, so they fired him for it. If you look at the record, the appellate even said what made her come to the decision to move out, leave the house, file for divorce was the utilities were turned off. So what kind of lifestyle is it if you've got bankruptcy, foreclosure, repossession? Okay. And granted, they may have been careless with their money, used poor judgment. That doesn't mean that she should be living in poverty when they were making $60,000, $80,000 before. But he lost that job. And because he's gone through surgeries, it's not that he's Dr. Welch and he's given opinions. The record is clear. He's been through surgeries. The transcript shows it. For his arms, his hands, his elbows, he had a portal tunnel, heart problems, nerve entrapment, nerve damage. It's a body shot. It takes your hands, your arms, your body in order to do the work. However, and he was denied SSI.  He was denied disability. He was denied Social Security. That's correct, Your Honor. Okay. And did a doctor testify to his inability to work in the trade that he was previously employed in? Well, Your Honor, Social Security doesn't do that. What Social Security does is make it a substantial gainful activity, which is any job at that time. I understand that. But was there any testimony apart from Mr. Welch that he was unable to perform parts of the auto body work? No, there wasn't. And the court did choose to find him uncredible? I think the word was he found him not credible on several matters. But the point being is the judge, well-experienced judge in domestic issues, not somebody that's been there recently or something for it, went down and said that the appellate didn't prove what he made. But that's almost like proving, you know, we don't have weapons of mass destruction. If he's not filing any tax returns and getting paid under the table, how is she supposed to prove that? In the record, Your Honor, the judge tried to assist the appellate in this matter and asked the appellate for one simple thing. And don't forget, Ms. Evans just said this filing was two and a half years old before you were in court. So in court, the judge asked the appellate, who admitted she was solely responsible for the 2011 taxes, the joint tax return filed by them, to present the tax return. This had been pending for two and a half years, and she was unable to do it. And the reason she said she was unable to do it is she'd left the tax return in the house that was foreclosed. I think we all know from common sense in two and a half years, since it's your tax return, you can ask the IRS to give you a copy of your tax return. And maybe they'll give it to you in two and a half years. Yeah, but your client could have done the same. But my client didn't have the burden of proving what he made. The burden of proving was on your client. But your client did have a burden to fill out a financial form in Madison County, didn't he? Yes. And that's not reflected on the financial form that he filled out, is it? On what now? What he earned in 2011. No, because it asks for the current status on the form, is what it asks for. It appeared to me from the record that when your client was testifying, the court said this, I'm really losing my patience with all this. I don't even know. I don't even know, which is what your client was saying. I'm just going to tell you I'm really not buying it. You don't appear to me to be a stupid man, so you better make a better effort to answer her questions. This is ridiculous. You're telling me you don't know anything about your life. I'm not buying it. So sit up straight and let's try to answer her questions. The question was, how much money do you have today? And she finally told him to empty his pockets. Yes, ma'am. So why is it that your client, who has these special skills, estimating the value of how much it's going to take to repair a car, for example, that doesn't require any use of his hands, maybe a pencil, why is it that he has not applied for any job, say with an insurance company, to do estimating? Why can he get away with that, so to speak? Because he doesn't have a high school degree. He doesn't have a GED. No, but many courts require you to at least make applications and then come into the court and say, well, what have you applied for? And your client has done nothing and has done that on his own. He's basically saying, I'm going to sit and wait. I disagree. And then at the end of this, if we affirm this order, he can go out to State Farm or Progressive or wherever and become employed for $60,000 and his wife, former wife, has no opportunity under the statute, which allows for review of maintenance, she has no opportunity to even come back and ask for a review. In response to the question, I don't think it's realistic because we go back to the 40s and 50s when lawyers did the insurance claim stuff in the mornings and the lawyers in the afternoon to make it exist back in the 40s and 50s, way before my time, but I've heard the old stories about it. We've got a gentleman that has no high school degree, no GED. He's got arm problems, hand problems, elbow problems, heart problems, all these medical things. He's had surgeries on. And he's going to go in and get a job with State Farm or State whoever it is, and he's not going to get it. Let's forget about that. We do know that he's going in five days a week, and we do know that his son's paying work comp insurance on him. He has a cell phone. He has the authority to write checks. He pays $100 a week for MACPRO tools. I mean, those are all indicia that he is working those five hours a week, and the court could have imputed an income that may perhaps was commensurate with what he at least was getting when he had his own sideline business, and the case law supports that. And I disagree with that, John. If you read that case law that was cited by the appellate, it's all situations where it was given to someone who was not competent. In this case, Granddad had the business, and these quote, I'm sorry, given to someone that's not competent. Right, not competent in business, if you read those cases. I've read each and every one of them. In this situation, it's a generation past either. Grandpa, who was an auto body man, he passed it to Mr. Wells, and Mr. Wells passed it to his son. Well, he's now voluntarily passing it to his son, which then takes away his ability to earn income, and that's what the cases talk about. Because he doesn't have the health in order to do it. It's just like this. So what is he doing five days a week? He's sitting there trying to help his son, talk to him, tell him how to do things since his son's a young age, which his father did for him. And that's the same tools we're talking about that the father, grandfather had, now they're in the grandson's hands. Another thing, I want you to believe that this Mafia Brothers auto body thing, that he moved it to his son so he could cover it. It was in Madison the whole time. Madison owned it the whole time that Mr. Wells ran it. His son lives in Gillespie. His son's running Gillespie. Nobody's talking about moving it in a stealth-like fashion, although I will say that the name of the company is unique. But the corporate entity, the ownership, was moved in a stealth-like fashion. It was moved from a man who, by your own admission, was mentored by his grandfather to a young man, with no disrespect, who was delivering pizza. He didn't work for his dad and get mentored for a period of time before very valuable tools were moved, tools that he's still making payments on. They aren't valuable tools. Valuable tools, I think the court could even take notice, are pretty expensive tools. Your Honor, the tools, they're wrenches, they're screwdrivers, they're sanders, they're board piles, they're paint guns, dollies, and hamsters. He's paying $100 a month? A week. A week. A week. $100 a week. We see those crooks drive around all the time. They hit every place they can, gas stations, body shops. And why is he paying $100 a week for tools that he doesn't use? Because he owes it for a long time. In other words, you get the tools this year, you're being paid on them five or six years from now, the same tools. Kind of like the law books used to be. Like Westlaw is a good example. If you pay 10 years later to pay for the books you got there, no longer are you being updated or something. That's what happens to these things. His son is being mentored by him, and he was mentored by his father. He was not, like I said, he had a high school and had a GED. He learned this business through his father. He's trying to teach his son this business. A good example, they go out and they hire, they're supposedly poor and living in poverty, only getting Social Security benefits, food stamps, a free cell phone, and a personal assistant paid by the state. If they go out and they hire a private investigator to watch my guy and see if they can catch him. I guess the only experience I have with private investigators is watching from TV. So are you saying that she has income that hasn't been reported? No, what I'm saying is the investigator went out, supposedly trying to find something like that. He couldn't find anything on my guy, and it doesn't take, I don't think it takes even a GED to figure. And I'll take Judge Cates' example about writing estimates. Why didn't the private investigator go into the shop and see if he could catch my guy doing any work, saying, you know, I got something to do in Eskimo, why don't you do it in Eskimo? I think they said that they shut the door and did not allow him to go in is what I read. No, no, no, no, no. The doors were closed, and he sat out in the car. He didn't do anything. The doors closed. I mean, the big doors, the doors closed. It's open. If it's closed, how are you going to make a complaint? How are you going to make a business case? The investigator, as I understand it, just said that he couldn't see what went on inside. Right, right. He couldn't see. But here's the thing. You know, we know your client is working, making something. And he testified. The trial court found that she certainly has a need for maintenance. Okay, she asked for $1,000 a month. Maybe that's not realistic. But why wouldn't the trial court order $50 a month just so this is not a permanent bar to maintenance, rather than leave your client in a position where he's completely off the hook? And now if he does go out and make a bunch of money, she can't do anything. I mean, at least then if he demonstrates an ability to pay, she can go back in and ask that it be modified. Isn't that an abuse of discretion when clearly she has proved a need for maintenance to order zero? You asked why the judge did that. Just like I said, we weren't the trial attorneys. I can't tell you what was in the judge's mind for that. I know this. I know from reading the order and reading the transcript that the judge gave every opportunity for them to prove what he was making or making anything. The judge, when you read the transcript, the judge went over backwards for the appellate, trying to help the appellate and the appellate's attorney. And the judge concluded after all that they didn't do their job proving it. And so I don't believe it's abuse of discretion. The judge has a right. She's there. She sees what's going on. And she went through it. If you read the transcript, Your Honor, and I assume you have, my client, the judge, was about very, didn't tolerate my client very well. So I think she pressed and she acted, and I don't mean to cross the line here, but she acted really an advocate for the appellate. So I'm saying give me a 2011 tax return for the appellate and tell my client to sit down, be quiet, answer the questions. You're not doing it. I mean, that's something that's extraordinary coming from the bench, I think, when the attorney should be doing that type of thing to the individual. I think the judge did not abuse her discretion. I think she really worked hard to try to get the evidence, elicit the evidence out so she could make the decision. But what she did do is ignore this whole body of law that says that if someone voluntarily changes their income status and chooses not to earn income and has the ability to earn income, the court has the right to impute some amount of income. And she did not do that even at $50 a month, and at the same time saying that this woman was not able to work and was eligible for maintenance. And there's no proof my client has the ability to work, period. He is working, even by his own admission. He's advising his son that he's not doing the body work that generates the $40,000 or $60,000 a year that he was doing before because of all the health problems I've elicited there. But he's at least making $100 a month to pay MATCO, and the son is... Making $100 a week. I'm sorry, a week. Thank you. And the son is paying workers' comp on him. That's evidence in and of itself that he's earning something. And he didn't deny he wasn't earning something. And that's really the position that Justice Chapman is saying, is what about that body of law that says where there's evidence that he has some income and has had the ability to earn income, what about that body of law that says the court should impute something to him? And in 504, the judge looks at all the factors, and she's looking at the medical factors. They're listed out in there to start with in the transcript, all the medical factors my client has. And she concluded, Your Honor, concluded that there was no proof of what my client made to show that she couldn't make any determination. And as Justice Stewart asked, I don't know why she didn't say, I'll leave it open or $1 a month until that. I can't answer that question. If I could answer that question, I'd have a crystal ball being in Vegas that wouldn't be here. Thank you, Mr. Walsh. Thank you, Your Honor. Ms. Evans, do you have a rebuttal? I do. I can state that as I handled the post-trial motion, that that specific request, and I believe the transcript of the hearing, is in the record. I specifically presented her with that case law and said, at a minimum, even if you don't think it's $1,000, give her something. Leave maintenance open. You don't foreclose her from ever getting maintenance when it's very obvious that she has a need. And what did the court say? She pretty much didn't say that. She took my cases under advisement and said that she would consider them and then, obviously, we wouldn't be here, except that she denied that. I also obviously asked if there was some level of proof that the court felt like it needed, that she could reopen evidence, and she chose not to take any of those avenues in approaching this case. I want to just correct a few misstatements. The math code tools were purchased after he indicated he could no longer work. He indicates in the record that that's a new purchase. He's newly purchasing these tools that I don't know why he needs if he isn't working. The light bill that was addressed, my client's frustration came not because the lights were shut off because they couldn't afford to pay the bill, but because she had taken her Social Security disability money, given it to LT, the son who now runs this business, who had subsequently not paid the light bill. That was her frustration, not that they couldn't afford to pay it because who knows where that money went. It didn't go to paying the light bill. Wasn't there also testimony that he had given his girlfriend like $2,500? Correct. He originally said he doesn't contribute anything, but then he said, well, he'd given her at least $2,500. There's a lot of back and forth of things that don't line up in husband's testimony throughout the trial. Again, the foreclosure and the tax return, I don't think they're terribly relevant, but they're relevant to this point. The tax return they finally figured out that they were talking about was from 2010. The house was foreclosed upon several years before that. It's quite obvious that the 2010 tax return was not left in the foreclosed house. It was left in the house she moved out of where he continued to reside until he moved to Gillespie, which, by the way, is where he lived when the shop was moved and reopened. It's for his convenience that the shop is now located in Gillespie. My client continues to live in Granite City. By that point, he had a fiancée who lived in Gillespie with whom he resided in Gillespie. The family moved to Gillespie. The shop was moved to Gillespie by the son, but Gillespie was a convenient location at that point for Tim. There was a previous question regarding wouldn't you take special skills to be able to operate this shop? Yes. By his own testimony, his son is still learning. He doesn't possess those special skills. Yet two years after that shop moved to Gillespie, it was still running. It was still operating. They were still paying their rent. They were still paying their power bill. I think it takes little inference to figure out who was providing the work that was leading to those bills being paid. The reasons this has been set forth before this court, I ask that you reverse the judgment of the court with specific order for a permanent award of maintenance for my client. Do you think there needs to be an additional hearing, then, to determine the amount? Quite frankly, based on his financial statement and what he indicates his expenses are, even if the court says we're going to impute you with just what you made at the sideline job of Mafia Brothers Customs, you can still find that he has the $1,000 a month available to him to pay the maintenance that my client said she needs. I think that's obviously within the court's discretion, but I think you can actually reverse this order with a specific award for maintenance. Obviously, my client, I guess that's just going to be another pro bono go-around for me because she obviously can't afford to pay for it. I think that what is in front of this court right now is sufficient for the court to reverse with an order for permanent maintenance, and the amount requested by my client, or quite frankly, if the court doesn't feel that that's an appropriate amount, with some other amount that at least allow her to keep her power, keep the lights on, try to live the basic existence that's really all she can hope to at this point, even if she gets the $1,000 more a month. And for those reasons, I would ask that, like I said, the judgment be reversed. Thank you, Ms. Evans. Thank you, Mr. Walker. Vote for your brief and arguments, and we'll take the matter under investigation.